The next case on the call of the docket is Agenda No. 14, Case No. 127117, Walworth Investments-LG v. Mu Sigma. This matter is, first of all, an argument from one side. I believe that Melissa Arbus-Sherry will definitely argue for 10 minutes, or 15 minutes, and Mr. Robert Clifford for 5 minutes. Okay, thank you. So, Mr. Alan Afron, if you're ready. Arfa. You may proceed. Thank you very much. May it please the Court, good morning. My name is Alan Arfa. I'm from Paul Weiss' law firm, and we represent the appellants. We're defendants below Mu Sigma, Inc., and its CEO, Mr. Rajaram. This case involves a stock purchase agreement governed by Delaware law. The principal issue before the Court is whether the language in that agreement, which is often used in contracts governed by Delaware law, should be enforced as written, just the same way that Delaware courts have enforced that language as written. Specifically in this case, Walworth was an investment vehicle. It invested $1.5 million in 2006 in the stock of Mu Sigma, a data analytics company. In 2010, four years later, in the Great Recession, Walworth sold its stock back to Mu Sigma for over six times that amount, over $9 million, 600% profit. And in the party's highly negotiated written purchase agreement, using, again, language used in Delaware court cases, both contracts and that's been passed on in Delaware cases, Walworth expressly represented the following, that Mu Sigma and its executives had not made any representations to them, outside of the party's agreement about the purchase, about the financial condition of the company, about the value of the stock being purchased. Nearly six years later, and according to Walworth itself, five years after it says it learned of whatever the basis for its claims was, supposedly, and after seeing how Mu Sigma performed in the meantime, Walworth files a lawsuit in Cook County seeking to set aside the transaction, which it's now decided it doesn't like. And it sought to do so by asserting fraud and breach of fiduciary duty claims, alleging the exact opposite of what they had represented in the contract. What they said in the contract is Mu Sigma had made no representations outside the party's agreement, but now it raised claims saying Mu Sigma had made representations outside the party's agreement. Those representations it claimed were false, and it claimed it had relied on them. There's no dispute the claims they raised were based on statements made outside the contract, and there's therefore, in our view, no dispute, or can be no dispute, that these claims are in direct contradiction to Walworth's express representation in the contract. Does the agreement contain any language expressly stating that the plaintiff did not rely on the extra contractual statements? What it said was the exact language. It's not in those words is the answer. Correct. It didn't use those exact words. What they said was stockholder acknowledges that neither the company nor the company's related parties has made any representation or warranty expressed or implied except as set forth herein regarding any aspect of the sale, purchase, repurchase stock, its value, that kind of thing. That's the exact same language that Delaware courts have over and over again said that that constitutes the same thing as saying we didn't rely on those statements because you've said no such representations were made to you, so you therefore can't show up in court and say, oh, yes, those representations were made to me, and we relied on them. I'll give you just one example. I could go through a whole bunch in the appendix, but let me give you one example, where they said holdings and the buyer agreed that neither the company, any seller nor any of their affiliates or advisors have made and shall not be deemed to have made any representation, warranty, or agreement expressed or implied with respect to the company other than those representations, warranties, and agreements explicitly set forth in the agreement. And the Delaware courts there, and there are other cases. I could cite five of them, all of which said when you say no representations are outside, that's the same thing as saying they're not relying on anything outside. Of course, the appellate court here relied on the fact that that case said the parties agreed. There's no statement that the parties agreed to this. Right, but that's incorrect in two respects. One, the parties do say at the outset they agreed. But the second, that's right in the contract at the beginning, so they're agreeing to all of this. But second, more importantly, what the Delaware cases say, you don't have to agree. The issue is what did that party who's coming into court now and saying I was lied to, I'm suing for fraud, if that party said no representations were made or I'm not relying on anything set outside the contract, if that single party said that, and here there's no question Walworth said that, it's in Walworth's list of representations and warranties, then it doesn't work. You can't come in to do that. I have a question here, really, one of perspective. I mean, we have two clauses, 3E1 and 3E2, and the appellate court found 3E2 basically was from your client's perspective and 3E1 was ambiguous as to whose perspective it was from. That's what they said. I don't see that. As I just read the language, we don't think it's at all ambiguous. Counsel, let me ask you a question. So Section 3 is entitled Representations and Warranties of Stockholder. Correct. Do we consider what it's entitled also in addition to the language of the section itself? What does it mean, Representations and Warranties of Stockholder? You can consider it because the stockholder is Walworth, so it's absolutely clear in Section 3 the representations and warranties are coming from Walworth. If you look at Section 4, by the way, it's clear those representations are coming from Mu Sigma, the buyer in the transaction. So, yes, those section headings do tell you whose representations are where. And just to finish up, sorry, with the question that was asked earlier, in 3, Walworth clearly says no representations were made to me. And also says, by the way, I have all the information I need to make a decision. And 3E1 is the specific representation, what we call the nonreliance clause, and Delaware courts call the nonreliance clause, where they say no representations were made to us. Where I think the appellate court went wrong was they then look at 3E2, which says, by the way, you, Walworth, need to understand that that representation, that no representations were made outside the contract, is so important that we're going to put right in the contract that you also represent and acknowledge that Mu Sigma is relying on your representation, that no representations were made to us. That doesn't make Mu Sigma's, I would submit, doesn't make Mu Sigma's, sorry, doesn't make Walworth's representation about no representations being made ambiguous. It does the opposite. It says, this is a really important representation. We need you to understand that. And the mere fact that a lot of Delaware cases that specifically address the issue that Chief Justice raised, specifically address, well, what about the fact that I don't see the word rely or I don't see the word reliance there, and there are specific Delaware cases that specifically say you don't need that, that the same point is being made. We're not going to require what the court in that case called Prairie Capital calls magic words. We're not going to make, you don't have to use the word reliance. You don't have to use the word rely. You don't have to use the word disclaim reliance. What you need to do is make clear what you are relying on and what you're not. What's the universe of things you're considering in entering into this agreement? What's the universe of things you aren't? And here the universe of things they were considering was what's in the contract. Here the universe of things they weren't considering is what's outside the contract. You know, obviously the reason we have these cases is there's a conflict between Delaware law and this decision. Correct. That's the problem. But the Illinois decision is consistent with Illinois' position on these kinds of things, ambiguity, isn't it? Well, I'm not so sure that's true. I would argue, first of all, first and foremost, we do have to apply Delaware law. That's what it says. We don't want a situation where parties in Illinois put in their contracts Delaware law. They don't know where the lawsuit's going to be brought, right? So they want certainty. They want finality. They want to know, well, I'm going to use this language. We're going to make Delaware law apply. I'm going to use this language I've seen in a lot of Delaware cases. And, therefore, I'm going to be comfortable it's going to mean X. Now, I can't have a situation where actually it turns out that if you sue me in a different state in Illinois, all of a sudden it's going to be a different principle. I know, but the Illinois decision is consistent with Illinois cases dealing with ambiguity. Yes, dealing with ambiguity, but they're not, in our view, consistent with all of the Illinois cases. We think there are Illinois cases that do recognize anti-reliance clauses and do enforce them. So we don't think it's totally inconsistent. And we think it's quite consistent, as I've said before, with Delaware. In those cases you're talking about that are different. There's different language in the reliance. Well, let me talk about that. Yeah, let me get to that. Because, again, I want to come back to this key issue of the words rely, reliance, are not in. If you look at our appendix, you can look at Kyron Higo, you can look at COLAB 9, you can look at Keystone, you can look at IAC Search, Great Lakes. Those are five decisions that I can mention that all use the other form, that no representations were made.  But in every case the Delaware court said that's a non-reliance case. Because you can't say no such as a matter of fact. Remember, they're making a factual representation to Mu Sigma. No representations were made. And then they're turning around and trying to come into court and say, oh, but there were statements made. And you can't say that when you need to prove reliance, because you need to prove the statements were made, they were false, they were relied upon. Even if this is a, even if 3E1 is from the plaintiff's perspective, is this a concealment case that takes it out of the realm of anti-reliance on representations? No. We don't believe that's true. We think, in fact, Delaware law is clear. The other side tries, and I should be clear, the appellate court did not rely on this ground. This is an alternative ground that the other side has raised. They've said, well, there are cases that say omissions. Yes, okay, let's assume it is an anti-reliance clause. I can't rely on those statements that were made outside the contract. So I can't allege this was a misrepresentation. But what I can allege is that this is an omission to tell the truth. And the Delaware courts say, hey, that doesn't work. That's a little too cute for us. That you can't just come in and say, as they do in this case, they say growth was moving from explosive growth to steady growth, which, by the way, happens to be true. But put that aside, you can't say that. They're saying, okay, we can't represent, we can't allege that that representation was false. What we're going to represent is you didn't tell us the opposite, that it was not moving from explosive growth to steady growth. So they say you've omitted to tell us the truth. And the Delaware courts say that doesn't work. There is one decision that raises this issue of active concealment, trans dime. A, trans dime is a very controversial decision in Delaware. There are a number of cases that say they got it wrong, that that's not fair. Anti-reliance clauses should be enforced as is. You can't just try to turn them into omissions. But if there's active concealment, according to trans dime, maybe. But active concealment, what they talk about is active concealment. So even if you accept trans dime, we don't think you should accept trans dime. Even if you accepted it, what it says is there somebody specifically asked question X, what's going on with your main customer? And they weren't told, well, the main customer is telling us they don't want to do business with us anymore. We're going to sharply cut down, and we want a cheaper price and all of that. So there they were specifically asked a question, and there were e-mails on the other side saying don't tell them what's going on. But in our appellate court, there's a question, a real question of fact dealing with that repurchase agreement, correct? Well, they actually found a question of fact on A, this ambiguity, which we don't think is a question of fact. We think it's absolutely clear when you look at this language. Delaware case is no question. You mean regarding the ambiguity, and then there was a question of fact dealing with the repurchase agreement? Well, I think they thought the ambiguity was how that language should be interpreted, and we don't think that that's right. They also found, this is actually a different issue, they also found a second question of fact over whether there had been a request for shareholder action. Right. So let me just address. Yeah, let me address that situation. So, again, this is not an issue the appellate court ruled on. But another argument the other side made below that the circuit court judge rejected was, hey, I get the idea there's an anti-reliance clause here, but maybe you should come to a different result because in the share repurchase, you have a corporation dealing with a shareholder, and how does a corporation act? It can only act through people, so it acts through one of its officers, which is what happened here. You had the company negotiating through its CEO, Mr. Rajaram, negotiated with the Ryans, and they both had fancy counsel and all of that stuff. But the other side said, well, hold it, he's a fiduciary, so maybe there's a different rule because he's a fiduciary. The truth is he's a fiduciary to the corporation, and he has fiduciary duties to the group of shareholders also. But where they found an issue of fact is they said, oh, well, maybe here there's a fiduciary duty of disclosure because there was a fiduciary involved, and that was because the scope of the repurchase agreement. Well, they said, right, they said basically maybe this is a request for shareholder action. That's what the Delaware cases call it, as opposed to an individually negotiated contract. But their basis for saying that was, and they agreed, by the way, they agreed with the general principle that when a corporate officer negotiates one of these share purchase agreements, there really generally isn't a fiduciary duty of disclosure. But they said, well, maybe there's an issue of fact, whether it's an individually negotiated contract on the one hand or is it a request for shareholder action. Now, what does that term mean? If you'll just give me a moment to explain. There, under Delaware law, if the corporation, let's say, wants to merge with another company and they have to go out to all their shareholders and get all their shareholders to vote on it, so it's not an individual negotiation. The shareholder has no opportunity to go back and forth and ask for information and work something out with the company. They just go to the shareholders as a whole and say, vote for the PECs. There, the Delaware courts have imposed a duty of full disclosure, very clearly. That's not a share repurchase where it's an individual. The appellate court said, well, maybe there's an issue of fact, whether it's a shareholder request for shareholder action, because there was something in the record that suggested at one point they thought about having another individualized negotiation with another, making this opportunity available to some other individual shareholder. A, that never happened. The record's very clear on that. But B, that doesn't mean the negotiation between Mu Sigma and the individual shareholder here at Walworth wasn't an individually negotiated transaction. It clearly was. And, in fact, one of the ironies of this case, the Illinois appellate court, in a case called Sims v. Tezak over 20 years ago, predicted this exact situation. And it had a contract governed by Delaware law, was applying Delaware law, and it looked at the Delaware law, and they said, you know, this argument was raised about fiduciary duty of disclosure. Is it a request for shareholder action? And they said, no, I don't think so. I don't think the Delaware courts would find this to be a request for shareholder action that would trigger a duty of full disclosure. And, lo and behold, that was 20 years ago, the Delaware courts have repeatedly said, yes, you got it right. That's an individualized negotiation. There is no fiduciary duty of disclosure when you're dealing one-on-one with an individual shareholder. And think about it. It makes sense, right, because in one situation, the shareholders have no choice, right? You're sending out a message to the whole group of shareholders that can't negotiate with each one. In the other situation, like here, you have very sophisticated parties. And, by the way, I should emphasize that that's a key word here for all the Delaware cases. These rules apply where sophisticated parties are at issue, as they were here. And they were both represented by very highly respected firms. Walworth, Sidley, Austin, and Mu Sigma's operating through a law firm called Cooley. Big firms, very sophisticated people who knew exactly what to put in and not put in. And had any of these statements that supposedly were made to them that they thought were really important, they just had to put them in the contract. That's all they had to do. I see my time is up. So let me just, again, end by saying we ask you to reverse the decision of the appellate court and reinstate the very thoughtful, well-reasoned opinions of the trial court, the circuit court. Thank you very much. Thank you, Mr. Arthur. Ms. Sherry? Good morning, Your Honors. May it please the Court. Melissa Arbus Sherry here from Latham & Watkins representing the plaintiff appellee, Walworth Investments. As you know, I'll be splitting my time with Mr. Clifford. I'm going to cover the Delaware law issues, and he'll take up unjust enrichment. I would like to start by taking a step back and really focusing on what the defendants are asking this court to do. They're asking this court to do something that no Delaware court has ever done. They're asking the court to hold that a fiduciary can outright lie to his beneficiary, can actively conceal the truth, and can brag about it afterwards and walk away with impunity simply by including a contractual escape hatch. That is not the law in Delaware. It's not the law in Illinois. And it's not the law in any jurisdiction that abhors fraud and that respects the fiduciary relationship. Now, let me talk about Delaware law, because I don't think there's any conflict here at all. Delaware does let parties contract around fraud, but only in two very limited circumstances. First, when there is absolutely clear and unequivocal language that that's exactly what the parties intended to do. And secondly, even then, only when it's an arm's-length relationship. Neither is the case here. First, and this provides two independent grounds for this court to affirm the appellate court decision. So the court could first hold, as the appellate court unanimously did, as Judge Griffin did, that the language in Section 3E is not a clear and unequivocal disclaimer of reliance. And I'll get back to that point in more detail. Or secondly, the court can hold that Delaware does not enforce even a clear and unequivocal disclaimer in the context of a fiduciary relationship unless there's been the necessary full and frank disclosure. I'll take both of those in turn. We spent most of the time this morning, I think, talking about the first argument. And, Chief Justice, you have it exactly right. This language in Section ---- It doesn't require any ambiguity. It doesn't require any ambiguity. It's a straightforward rule that ñ and it's a common rule in Delaware and Illinois, which is that you can't contract around the fiduciary duty of loyalty. The Malone case in Delaware said it's an unremitting duty. It is sacrosanct. It is the constant compass that guides every interaction between a director and its shareholders. And to be clear, this has nothing to do with the request for shareholder action issue. It's an independent requirement. When you have a fiduciary relationship, there's a duty of loyalty. Delaware statutory law says you can't exculpate yourself from that duty. Delaware case law says you can't contract around it either. And Illinois law is exactly the same. The Marler case that we cite in our brief to this Court is a very recent decision. It applies that exact rule in the context of an anti-reliance provision. And what it says is when you have a fiduciary relationship, I mean, an anti-reliance provision, just like a general release, it's a self-interested provision. If you want your beneficiary to sign off on a provision or an agreement in which you have a self-interest, you have to make a full disclosure of the facts, or you have to be able to show that your beneficiary knew of the fraud. So it comes up in settlement context a lot. If you sue someone for fraud, can you enforce a release? And in Delaware, you can only if the person was aware of the fraud. And so in the release context, there's really robust case law. You can look at the Heckman decision out of Delaware, the Wal-Mart decision out of Arkansas, the Mazak decision out of the Sixth Circuit. Those last two do a very good job summarizing the vast majority rule in this context, including citing Illinois law, the Quickler case. And the same rule applies in the context of an anti-reliance provision. And back to the first aspect of your argument on the ambiguity thing. Your opponent basically says that's out of the whole plot, that there's no ambiguity in the contract in that specific area. Yeah, so we think the appellate court disagreed correctly on that. And let me explain why. It is true there is no magic words requirement. But it's also true that this provision, when you look at it as a whole, as you have to, looks absolutely nothing like any of the cases they cite in the chart they append to their brief. None of them had reliance language like this one does. I mean, that is the key difference here. The parties in this case, we know that when they wanted to say what they were relying on and what they were not relying on, they used the word rely. They did it three times in this pretty short purchase agreement. They did so in 3E Romanet 2, which we've talked about a little bit. They did so in 3H. They specifically there said Walworth solely relied on X and didn't rely on Y. They did so in 4D. So two answers to that question. The first one is, if you look at the Delaware cases, there's a lot of them that have this no representation type language. MPUSA, True Blue, they don't enforce it and they don't try to give it some alternative meaning. So that's sort of the first legal response. But I think you can give it an alternative meaning. If you look at all of 3E, start with the first sentence. The first sentence says that Walworth received information. Then this next sentence says, but no representations or warranties were made. I think if you're trying to reconcile those two first sentences, first and second sentence, the best way to do it is to read the representation language as talking about contractual representations. I think you asked the question, you know, the headers of Section 3 and Section 4 talk about representations or warranties that were made by both parties. It's sort of a term of art. These are contractual representations that can be enforced or not enforced through a breach of contract action. So I think there is an alternative reading. And I think that only furthers the ambiguity that exists in this contract. The Anschutz decision, it's a case that we cite in footnote 4 of our brief. It's one of the many cases where the Delaware courts have declined to enforce anti-reliance provision. I think that one might be worth looking at. It had a similar first sentence as to what we have here, talking about an investigation that was done, information that was received. And the party there argued that you could read that sentence as actually saying the opposite, that we did get this information and we relied on it. And the court agreed that that was a reasonable reading of that provision. So the point is I think there is an alternative reading. I don't think the case law requires it. And the other major distinction, not to jump too much back and forth between the two arguments, but even if you look at all of the cases in Delaware, all of the cases that they cite in their chart, they're all arm's length relationship. I mean, these are M&A transactions with private equity firms, months of due diligence, battle rooms and the like. None of them involve a fiduciary relationship. And when you look at cases where there is a fiduciary relationship, you look at the recent McDonald's case, you look at the Nanty Holdings case that we cite in our brief, you look at the Illinois Marler case, that is just fundamentally different and courts treat that differently. And so it would be pretty remarkable for this court to hold that Delaware, despite how much it values the fiduciary duty, despite the fact that it says the duty of loyalty is sacrosanct, that it can't be contracted around, that it actually can be contracted around. All you need is what they call an anti-reliance provision. Can I ask you, I mean, the appellate court found that 3E2 was from the perspective of company. And reading this, it says stockholder acknowledges 1 and 2. Isn't it the stockholder who's acknowledging both 1 and 2? I think the stockholder is. I think what the appellate court was getting at is maybe the same point we are, which is what's significant about that is it breaks up the stockholder from Mu Sigma, in a way that cases like Hiron Hego did not. And I think why that's significant is because it separately talks about reliance. And so all of the other cases, they could look at certain language, they could interpret what it meant. They didn't have the same contrast that we do here. And usually when parties in the contract use different language, they use different language because they intend to say something different. So we have the sort of textual proof of that, which is three separate times. They said the word rely. They didn't say it in 3E Romanet 1. We also have just confirming the textual ambiguity. We know why that language was in the contract initially. It was in the draft agreement. And Waller specifically took that out of the agreement. That is extrinsic evidence. It only confirms the textual ambiguity. But I think it goes to the fact that in this agreement, when you look at it as a whole, when these parties wanted to talk about reliance, they used the word rely. And I think that's what the appellate court was getting at. Unlike Hiron Hego, where it said both parties here, it kind of divides up what the parties are acknowledging and what they're representing. And it does so in a fundamentally different way. I think just to get back to a couple of different points that were raised during the first half of the argument, you know, I think it's important to remember what stage of the proceeding we're at here. This is a summary judgment motion. These are motions to dismiss. The facts at this point stand undisputed. And so I don't want to go too far down this road, but a number of, you know, points were made with respect to the facts. This isn't an oral, you know, representations case. There is written language. There's an e-mail on March 22nd in writing where Rajaram says the company is moving from explosive growth to steady growth. Two weeks later, there is another e-mail from Rajaram to Mu Sigma, to all of the employees, to all of the insiders, not to the lions, saying that the company is poised for explosive growth. So this is not a, you know, what was actually said orally kind of case. There is written evidence that he was telling his beneficiaries, the lion family, something fundamentally different than what he believed and what he was telling everybody else. On the fraudulent concealment issue, I don't think the Court has to get there. I think the way to affirm are one of the two grounds I mentioned, either to agree that there's ambiguity or to say you just can't do this in a fiduciary context. But if the Court gets to the issue, I know my colleague likes to say that Transdime is a stand-alone decision. The reality is there's three cases that follow Transdime. And so, you know, they point to their favorite four cases. We point to our favorite four cases that doesn't make a consensus. I think the through line with these cases, though, is that when you have, when you do not have a representation with respect to the accuracy and completeness of the information provided, the Delaware courts assume that you don't intend to preclude a fraudulent concealment claim, rather. If you look at the pilot error decision, that case actually enforced an anti-reliance provision in this context, but it did so because the parties had made representations about the accuracy and completeness of the information. And what the Court there said is... So wouldn't your argument eviscerate anti-reliance clauses? Let's assume we're talking about people with an arm's length transaction. Wouldn't your argument based on Transdime eviscerate anti-reliance clauses in all these cases? I don't think it would for two reasons. One is I think what Clery Capital was worried about is what my colleague talked about. The idea of these flip side omissions, it's really easy to take a misrepresentation and turn it into an omission. But that's not the full category of omissions. I mean, there's active concealment claims which are fundamentally different than that. I think the defendants would recognize that. There are duties to disclose. Prairie Capital itself recognized that when you have a fiduciary relationship, sometimes you have a duty to speak. That is fundamentally different than the kind of flip side omission that Prairie Capital was worried about. And there's other omissions that are not just the exact opposite. And so I don't think it would get rid of it. But I also don't think it would get rid of it for a second reason, which it's really easy to add language to an anti-reliance provision that either says omission or has this very common representation with respect to the completeness of the information that's being provided. Again, that was in the Pilot Air case. If you look at a number of the cases, they include that representation. So I think it would be very easy for parties to do exactly that if that were a concern. So, counsel, how do you respond to opposing counsel's argument? Hey, look, these are sophisticated parties. They both have high-powered lawyers, you know, so, you know, this was arm's length. You know, he didn't say arm's length, but I think that's the point. Yeah, so I would respond by saying in the fiduciary context, it just doesn't matter. Beneficiaries are often sophisticated. If you look at the Walmart case, the beneficiary there was Walmart. If you look at the McDonald's case, the beneficiary was McDonald's. Same with Heckman. And so in that context, the level of sophistication may matter. If you're talking about an arm's length relationship, if it's an unsophisticated party, Delaware probably wouldn't enforce the anti-reliance clause regardless. That's the Delaware Supreme Court's decision in Norton back in 1982. But when you're in the context of the fiduciary relationship, there is a duty of loyalty regardless, and the level of sophistication just doesn't play into it. The Del Monte case that's cited in that footnote in McDonald's makes that clear. It says, yes, we have freedom of contract, but freedom of contract yields to fiduciary principles even when we're dealing with sophisticated parties. And so I think that's the answer. Your key argument is loyalty. Your key argument is loyalty. I think that is an argument that disposes of, well, the entire case at this level and at least sends us back for trial after six years. I think there's other ways to get there. I think the way the appellate court got there is a perfectly good way to resolve this case also. It's very narrow. It deals with a very specific language that's at issue. And I will turn it over now to my colleague to talk about why any result other than an affirmance would be unjust. Thank you. Mr. Clifford? Justices, good morning. May it please the Court. Robert Clifford, also for Walworth Investments. The courts of Illinois have always been and remain firm in rejecting and to enforce contracts that are tainted by fraud. That stands alone as one of the benchmarks of unjust enrichment claims, and it should not be allowed here. The first thing that the unanimous appellate court stated was that this outcome was the result of a reverse Madoff scheme. And they declared that the defendants were guilty of that scheme, and it's one of that Madoff is certainly one of the worst examples of fraudulent activity here in our nation. And we're asking that this Court use its power to reject that kind of activity here in the State of Illinois and to affirm that in Illinois our public policy is against that kind of activity. My colleague talked about some of the facts in this case, and she correctly pointed out several e-mails. And what, Justices, we see nowadays in the trenches, in cases, is a lot of e-mail activity and all the e-discovery that we're engaged in. And we are finding that, and in this case, Rajaram, you've been told about him, he's the chairman of Mu Sigma. He approached the Ryan family. He sought their investment because he knew that Walworth would provide him with necessary funding, support and guidance that they needed, the so-called Rolodex and networking that the Ryan family provided and their credibility. And he used that, and he used that and needed that to get his company rolling. But once he had it rolling, he developed a scheme because he viewed Mu Sigma and does view Mu Sigma as his baby. He wanted his company back. And as part of his way of doing so, he approached the Ryans, and we have facts. And what we're learning in the trial court level is that e-mails are a treasure trove of truth, that for whatever reason nowadays it's happening in many, many cases that we get into e-discovery and we find e-mails that are basically confessions. And in that, you've already heard of one where he was bragging about his dealings with the Ryans. And on that particular e-mail, he had forwarded that e-mail where he said to his colleagues and all the leadership that they had completed this transaction. And he was congratulated by his CEO. And his CEO told him that you tempted the Ryans, that you did it but just enough to do the deal. You weren't overbearing with it, that you tempted them just enough, and you should be congratulated by that. You were brilliant when you did that. These are not our words. These are their words. Counsel, what's wrong with bragging about, hey, we got the deal done? That was the whole purpose. Context matters, Justice, and that is to say that in this context, we knew that simultaneously with that e-mail is what you heard a moment ago, that representations, affirmative representations were being made to the Ryans, that there was no upside left to this company, that the company was flat, that you're not going to benefit any further from this company. So what I recommend to you is get out now because I need you for my next deal. And my next deal is going to be a bigger deal. And by the way, that next deal never happened. We know that factually. But at the same time, further e-mails show with the CFO, do not send the Ryans the March reports because the March reports in fact showed the explosive growth, which two weeks later he was bragging about again to his employees. So it's context, Judge, and it's on the timeline of what's taking place. This is a fraudulent scheme that is unfolding because at that time that he was telling the Ryans one thing, the company was experiencing another, and he deliberately instructed, he deliberately instructed his CFO to withhold information from the Ryans. That's the factual record that we're dealing with. So that in the end, and after that, by the way, he told his CFO and the rest of the company, we need to move like lightning to complete this deal. And that's what they did. They completed this deal, and the reverse Madoff scheme worked. So I see my time is up. But, Justices, if I may then end by simply saying that the finding of the appellate court was well-reasoned, that summary judgment should not have been entered, that there is evidence that we believe establishes the unjust enrichment and benefit that should not have taken place here, and it shocks the conscience of the community in Illinois. We should not allow that to stand. I'm available for any questions if there are any. Thank you very much. Thank you. Mr. Arpa? Thanks. Counsel, I'm sorry to ask you a question. That's okay. Sure. I'm very interested in, you know, opposing counsel's discussion of the fiduciary duty. Sure. And I'd like you to explain to us why that doesn't apply here or why it doesn't apply in the way that opposing counsel is indicating. Absolutely. Again, fiduciary duty was an issue that was raised. We were debating below in the trial court, is this anti-reliance, is it not, went back and forth. Late in the game, they said, aha, they stumbled on this fiduciary argument. The reason it doesn't work is that the case law is absolutely clear. It doesn't work for several reasons. But first and foremost, that in this situation, fiduciary duties, you know, she cited Malone, which says they're unremitting, but the Delaware courts in that same case went on to say, but let's be clear, the exact nature of the fiduciary duty and the exact conduct you're supposed to take depends on the context. The context here is, as the court was making clear, two sophisticated parties represented by counsel negotiating a situation. The exact situation that the court in Sims v. Teasic, the appellate court in Illinois, anticipating what was going to happen in Delaware, said, that's not a request for shareholder action. There is no fiduciary duty of disclosure. Moreover, this argument that, well, maybe there should be an exception to these anti-reliance cases where it's negotiated by a fiduciary. First, that's wrong for the reason I just gave. The cases are clear. Stock repurchase. In that context, no duty. You'll notice, by the way, I have to comment, they're always citing to these other fiduciary duty cases like McDonald's and Walmart, where you have a fiduciary negotiating with the corporation a severance agreement, separation agreement. And there they say, whoa, you're the corporation negotiating with your executive. That executive has to tell you things, has a duty of disclosure. Totally different context. That's not the shareholder cases like Sims v. Teasic and other ones where they say it's an individualized negotiation, no fiduciary duty. And, by the way, they're also just plain wrong. They cite these Heckman cases, if I'm pronouncing it correctly, Humbin v. Heckman. In Heckman, they did apply an anti-reliance clause in a case involving a fiduciary. They said the corporation could not raise as claims, fraud claims, against the fiduciary things he'd said outside the contract because they had agreed that things outside the contract didn't count. So they have applied it. That's Heckman. And let me just step back more broadly. What are we really talking about here? The Delaware courts say, look, you have to balance. It kind of goes to what Mr. Clifford was saying. You have to balance. We all hate fraud. The law abhors fraud. They abhor it in Delaware. They abhor it in Illinois. But we also abhor a fraud committed by a party who says in a contract, no representations were made to me outside the contract, and then shows up in court saying the exact opposite. That's an RAA management. The Delaware Supreme Court makes that clear. And in a case called Abbery, the court went on to say, look, we've got to balance those two things. So how do we balance it? Here's how we're going to balance it. If you have that kind of language, you can't sue for fraud. You can sue for breach of fiduciary duty if there's something in the contract where the other side lied to you or they told you a falsehood. What we're not going to do is go down the road and talk about every little fact and what was said outside and what was said in this email, who said what to whom. And we may get it wrong, by the way. The Delaware courts specifically note one of the reasons for balancing it this way is the courts may get it wrong when it deals with things outside the contract. So Delaware draws the line. They say if it's within the contract, great. You can sue for fraud. You can sue for breach of fiduciary duty. But we're not going to allow you to lie. We're not going to let you say in a contract no representations were made and then, as they say in RIA management, turn around and show up here and say. Right. But the issue of ambiguity is one of the law for the court. The court has to decide that. And to us, when you look at that language, and I would stress I'd ask the court to look at the other Delaware cases because clearly they read them differently than we do. We think the language is virtually identical to the language here. They say it's quite different. We don't think it's quite different. And as they admitted, you don't need magic words in it. It's got to be something that just clearly says no representations were made or we're not relying on anything outside the contract. So we think that's a clear issue of law that the court should resolve. Let me also, there are a couple other things. Which means there's no ambiguity. Say that again. Which means there would be no ambiguity. Correct. Correct. And we think the Delaware courts say when they look at similar language, this is unambiguous. They dismiss claims. They don't let parties go to trial. I don't want to spend a lot of time on the facts Mr. Clifford mentioned, but I just want you to understand they were receiving monthly reports, very accurate, detailed financial reports every month. They knew exactly how the company was doing and they knew exactly how it was going to do. And it was moving from explosive 200% a year growth to in the year 2010, there was a projection in there of like 80% to 90% growth and Ryan's family, it was behind Woolworth, had that. They knew that. It wasn't hidden from them. That was given to them for the first couple months, same projection, and then by the third month they were negotiating. So our client took the position all communication should go through the lawyers. If the lawyers ask for it, we'll give it to them. They obviously knew they weren't getting these reports anymore. They were showing up every month. They stopped and they never asked for the future ones, the subsequent ones. And there's nothing new in the subsequent ones. It has that same projection for 2010. Transdime and concealment, let me just talk about for a minute. They're right to say there's a disagreement among Delaware courts. We think the better reasoning, if you read them, is the courts like Prairie Capital that have rejected transdime precisely for the reason that was mentioned, that it's just too easy to allege omissions and flip misrepresentations, alleged misrepresentations, into omissions. But I should also add a couple very clear distinctions between this case and transdime. One, in this case, the language is different. It says we have all the information we need. In other words, nothing's been omitted. We have everything we need. And second, there's a release. One of the things you didn't hear a lot about from the other side, and maybe I should spend more time in my argument, there's not just the anti-reliance clause here. You have a release. I mean, they actually released. It said we're not going to sue you over the events leading up to this contract, including it said we're not going to sue you over omissions. The word's right there. It's in the release. So in our view, this whole omissions thing is also released by the release. And third, I should finally say, again, on this concealment thing, there was no concealment. I mean, the most they can do when they try to come up with concealment is talk about these financial reports that they knew they weren't receiving. That wasn't in any way concealed from them. The thing they quote, by the way, on explosive growth, that was an internal comment that was made in a sort of cheering up the troops kind of way to your employees. We're poised for explosive growth. There's nothing inconsistent between that and what was said. I was also a little shocked to hear they even repeated one of the allegations that was that there was no growth on the horizon. And at his deposition, I said to Mr. Ryan, well, you knew there was growth. You got that financial report that said for the rest of the year we're going to be growing, just not at 200 percent, but it'll be less. But you knew there was growth. And he said, yeah, you're right. I was just kind of exaggerating a bit in my notes because I was getting ready to talk to somebody else. So that, I don't know, shouldn't even be here, and I just felt I had to respond to that even though, again, the whole point of these anti-reliance clauses is that parties don't get into these who said what battles. And frankly, we've already been put through six years of very expensive litigation, which in our view never should have happened. And the whole point of these clauses and the whole point of having courts enforce them as written is so parties don't spend forever maybe getting things wrong over who said what when and was it true and all of that. The whole point is to enforce them. And that's what ambiguity does, doesn't it? If there is. If you have ambiguity, then you open the door to go down that road then. Exactly. And that's why we think the language here is unambiguous, and that's why the Delaware courts have said if you use language like this, and, again, I just ask the court to look at the other cases that talk about anti-reliance clauses and use the similar language, see if you agree with us that it is substantively identical, and then I hope you will conclude, as I conclude my remarks, by asking once again that you reverse the appellate court and restore the very well-reasoned, well-thought-through decisions that were reached by the circuit court. Thank you very much. I enjoyed very much appearing today. Thank you very much. Thank you for the opportunity. Case number 127177, Walworth Investments, LGLLC v. Moo Sigma et al. will be taken under advisement as agenda number 14. Thank you, Mr. Arpa, for your arguments this morning, and Ms. Sherry and Mr. Clifford. Thank you very much.